UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| FEDERAL TRADE COMMISSION, <br><br> STATE OF CALIFORNIA <br><br> STATE OF ILLINOIS, <br><br> STATE OF MINESOTA, <br><br> STATE OF NEW YORK, <br><br> STATE OF WASHINGTON, <br><br> and <br><br> STATE OF WISCONSIN, <br><br> *Plaintiffs*, <br><br> v. <br><br> AMGEN INC. <br><br> and <br><br> HORIZON THERAPEUTICS PLC, <br><br> *Defendants*. | No. 1:23-cv-03053 <br><br> Judge John F. Kness |

**PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANTS'
JOINT MOTION TO MODIFY THE INTERIM CONFIDENTIALITY ORDER**

Plaintiffs oppose Defendants Amgen Inc. ("Amgen") and Horizon Therapeutics Plc's ("Horizon") Joint Motion to Modify the Interim Confidentiality Order, which seeks to allow five in-house attorneys access to confidential information in this case. ECF No. 79. Defendants' in-house counsel appear to be involved in competitive decision making and have regular exposure to executives that set competitive strategy at their respective companies. Thus, although those counsel may assist outside counsel in this litigation, Defendants have not met their burden to show that there is good cause to permit them to view nonparties' competitively sensitive confidential information.[1]

Defendants' motion should be denied because: (1) Defendants fail to meet their burden of demonstrating good cause because the in-house attorneys' declarations regarding their roles are deficient, particularly in light of public information suggesting that at least Mr. Graham and Mr. Clayton have some involvement in competitive decision making; (2) Defendants fail to show that, in the absence of the relief requested, they will be prejudiced in defending this case; and (3) granting Defendants' motion could prejudice nonparties whose confidential information is at stake.

## I. Defendants Fail to Show the Requisite Good Cause for the Proposed Modification

Merger litigations often involve confidentiality orders that prohibit in-house counsels' access to nonparty confidential information. *See, e.g.*, *United States v. Aetna*, No. 16-cv-01494, Dkt. No. 132 (D.D.C. Sept. 30, 2016) (attached as Ex. 1); *United States v. Anthem*, No. 16-cv-

---

[1] The five in-house attorneys at issue are: Jonathan Graham, Amgen's Executive Vice President, General Counsel, and Secretary; Kimberly Dunne, Vice President in Amgen's legal department and head of the Corporate Litigation Group; William Diaz, Senior Counsel in Amgen's Corporate Litigation Group; Sean Clayton, Horizon's Executive Vice President and General Counsel; and Nelson Alexander, Senior Vice President in Horizon's legal department. ECF No. 79 at 2-3.

1

01493, Dkt. No. 161 (D.D.C. Sept. 26, 2016) (attached as Ex. 2); *United States v. US Airways*, No. 13-cv-01236, Dkt. No. 55 (D.D.C. Aug. 30, 2013) (attached as Ex. 3); *United States v. Dean Foods Co.*, No. 10-cv-00059, Dkt. No. 30 (E.D. Wis. May 20, 2010) (attached as Ex. 4). Thus, Defendants bear the burden of demonstrating that good cause exists for the proposed modification. *See In re Broiler Chicken Antitrust. Litig.*, No. 16-cv-8637, 2022 WL 2257179, at *3 (N.D. Ill. June 23, 2022) (citing Fed. R. Civ. P. 26(c)).

In assessing good cause, a court must decide whether allowing in-house counsel to access competitively sensitive information "creates an unacceptable risk of, or opportunity for 'inadvertent disclosure' of that information" to personnel at Defendants' companies. *FTC v. Advocate Health Care Network*, 162 F. Supp. 3d 666, 667-68 (N.D. Ill. 2016) (citations omitted); *see also United States v. Deere & Co.*, No. 16-cv-08515, Dkt. No. 286, slip op. at 3 (N.D. Ill. Apr. 26, 2017) (in response to a similar motion in a merger case to modify the protective order to permit access for in-house counsel, noting that "it simply blinkers reality to believe that non-party competitors' confidential information can be sufficiently protected by the proposed modification") (attached as Ex. 5). Courts must balance "the risk of inadvertent disclosure against the burden" imposed in not permitting access for in-house counsel. *Kraft Foods Global Inc. v. Dairilean, Inc.*, No. 10-cv-8006, 2011 WL 1557881, at *1 (N.D. Ill. Apr. 25, 2011) (citing *Pfizer Inc. v. Apotex Inc.*, 744 F. Supp. 2d 758, 762 (N.D. Ill. 2010)).

Courts have recognized "[t]he risk of inadvertent disclosure is obviously higher" in cases where "in-house counsel are involved in competitive decision making." *Advocate Health Care*, 162 F. Supp. 3d at 669. In-house counsels' professional roles "often intimately involves them in the management and operation of the corporation of which they are a part." *Id.* at 668 (quoting *FTC v. Exxon Corp.*, 636 F.2d 1336, 1350 (D.C. Cir. 1980)). Granting in-house counsel access to

2

competitively sensitive information in the course of discovery presents the risk of such counsel inadvertently divulging or using that information to gain a competitive advantage. *See id.* As a result, where in-house counsel is involved in competitive decision making, it may be appropriate for that party "to be forced to rely on outside counsel." *Id.* at 669 (citing *U.S. Steel Corp. v. United States*, 730 F.2d 1465, 1468 & n.3 (Fed. Cir. 1984)).

"Competitive decision-making includes 'business decisions that the client would make regarding, for example, pricing, marketing, or design issues when that party granted access has seen how a competitor has made those decisions.'" *Silversun Indus., Inc. v. PPG Indus, Inc.*, 296 F. Supp. 3d 936, 939, 941 (N.D. Ill. 2017) (quoting *FTC v. Whole Foods*, No. 07-cv-1021, 2007 WL 2059741, at *2 (D.D.C. July 6, 2007) (citations omitted)). Because the "'competitive decision-making' inquiry" is primarily concerned with "the risk that such information will be used or disclosed inadvertently because of the lawyer's role in the client's business decisions," courts conduct such inquiries on a counsel-by-counsel basis. *Id.* (citing *Exxon*, 636 F.2d at 1350; *FTC v. Sysco*, 83 F. Supp. 3d 1, 3-4 (D.D.C. 2015)).

Defendants have not established good cause for amending the confidentiality order. Defendants state that their designated in-house attorneys "are not involved in pricing or access negotiations, competitor or pricing analyses, research, development, marketing, financing, or obtaining regulatory approval for, or seeking reimbursement for any of Amgen's or Horizon's products." ECF No. 79 at 3. But public information suggests that Mr. Graham, Amgen's Executive Vice President, General Counsel, and Secretary, and Mr. Clayton, Horizon's General Counsel, are regularly involved in competitive decision making.

For example, in his LinkedIn profile, Mr. Graham acknowledges that in addition to his legal role, his position includes advising the Amgen "Board, CEO, and senior management on

3

strategic business . . . and related matters." Ex. 6. Mr. Graham similarly describes his expertise leading legal professionals involved in commercial and corporate affairs teams. *See id.* As Amgen's corporate Secretary, it is reasonable to infer that Mr. Graham has regular contact with Amgen's Board of Directors and other senior management, which presents a risk of inadvertent disclosure.

Public information similarly indicates that Mr. Clayton, Horizon's General Counsel, is involved in Horizon's competitive decision making. In a press release, Horizon announced that Mr. Clayton "will report directly to Tim Walbert, chairman, president and chief executive officer and will join the Company's executive committee." Ex. 7. The executive committee appears to comprise the chairman, the chief strategy officer, and other highly placed Horizon colleagues. Ex. 8. According to Horizon, this group of "executives together apply their extensive commercial, scientific, development, acquisition and business expertise in the biotechnology and pharmaceutical industries when making key decisions for our company." *See id.* Thus, both attorneys appear to have at least some involvement in competitive decision making.

Courts have found this type of close interaction with a company's competitive decision makers to be dispositive on the question at issue. For example, in *Sysco*, the court denied in-house counsel access to competitors' documents where it was shown that in-house counsel was present when pricing, purchasing, and marketing issues were discussed at executive team meetings, even though in-house counsel did not have direct decision-making authority. *Sysco*, 83 F. Supp. 3d at 4 (concluding that in-house counsel seeking access to confidential information was "too close to [those involved in] competitive decision-making functions"); *see also Silversun Indus.*, 296 F. Supp. 3d at 941 (applying this test from *Sysco* to in-house counsel acting as corporate Secretary). Like the in-house attorneys in *Sysco and Silversun*, Mr. Graham and Mr.

4

Clayton appear to have frequent interaction with teams and executives that are responsible for Amgen's and Horizon's competitive strategy and decisions. In light of the nuances of in-house counsel roles, Defendants' cursory declarations, including those for Ms. Dunne, Mr. Diaz, and Mr. Alexander, do not provide sufficient information to meet their burden. *See Silversun Indus.*, 296 F. Supp. 3d at 941-43 (concluding that "brevity and lack of detail" in an attorney's declaration warranted further inquiry, and that "the risk of inadvertent disclosure cannot be ignored because counsel in the case says it does not pose a meaningful problem").

Defendants also fail to establish why access to highly sensitive information by these attorneys is indispensable to this litigation. Defendants assert that their respective in-house counsel are more familiar with the organizations and thus better positioned than outside counsel to rebut Plaintiffs' case. ECF No. 79 at 4. Yet Defendants do not explain why outside counsel would be hamstrung in identifying relevant evidence without in-house counsel's access to confidential information. Defendants are represented by three well-resourced and talented law firms. Defendants have not, and indeed cannot, show that these teams of attorneys cannot effectively litigate this matter. Thus, Defendants' contention that these attorneys need access to the highly sensitive information here should not persuade.

Notably, the documents at issue belong to numerous nonparties who were compelled by civil investigative demands to turn over highly sensitive information, including short- and long-term business plans, documents revealing negotiation strategies, and information about pricing decisions. Nonparties include companies that have significant dealings with Defendants, including their competitors and customers. Inadvertent disclosure of such highly confidential information could give Defendants "an unfair advantage in competition" and "provide the Defendants with a significant advantage in future negotiations with these" nonparties. *United*

*States v. Aetna, Inc.*, No. 16-cv-1494, 2016 WL 8738420, at *5-6 (D.D.C. Sept. 5, 2016). Thus, the risks introduced by the proposed modification further outweigh any generalized needs that Defendants' in-house attorneys have for this information.

Defendants fail to provide the necessary assurances that their selected in-house attorneys, particularly their respective general counsels, are not involved in competitive decision making and that the requested access to confidential information would not carry an unacceptable risk of inadvertent disclosure. To be sure, in-house counsel can still participate in the litigation and provide input into matters affecting the case. However, disclosure to these in-house attorneys of confidential information exchanged in discovery is not necessary for the case to be properly litigated, and disclosure would create an unnecessary risk of inadvertent disclosure.

## II. Alternatively, the Court Should Impose Limitations and Conditions on In-House Counsels' Access

In the alternative, if the Court is inclined to grant access to some of Defendants' in-house counsel, the Court should consider imposing certain limitations and conditions to lower the risk of inadvertent disclosures. *First*, a two-tiered structure may be appropriate, in which nonparties may designate information as either "highly confidential" or "confidential." The Confidentiality Order could then permit certain in-house counsel deemed uninvolved in competitive decision making to access information designated as "confidential," while prohibiting access to information designated as "highly confidential" absent a showing of a particularized need. *See, e.g.*, *United States v. Google LLC*, No. 20-cv-03010, Dkt. No. 98, § E (D.D.C. Jan. 21, 2021) (prohibiting access to "Highly Confidential Information" unless the Court finds that in-house counsel "has a particularized need for access" that "outweighs the risk of harm") (attached as Ex. 9). This approach allows nonparties to protect documents that are highly sensitive, while allowing certain in-house attorneys to access confidential information. *Second*, the Court could

also consider restricting those in-house counsel permitted to view confidential material from involvement in competitive decision-making activities for a limited period of time. *See, e.g.*, *FTC v. Meta Platforms, Inc.*, No. 20-cv-03590, Dkt. No. 134 at 16-17 (D.D.C. Mar. 25, 2022) (conditioning in-house counsel's access to confidential information on a two-year prohibition from participating in competitive decision making or certain legal actions) (attached as Ex. 10). *Third*, the Court could provide additional opportunities for nonparties to seek added protections if their confidential information is likely to be accessed by in-house counsel. Defendants' proposal only implicates those nonparties that appear on Plaintiffs' witness list, but Plaintiffs' final witness list is not due until September. For any nonparty who is subsequently added to Plaintiffs' witness list, the Court could provide some period of time in which that nonparty could seek additional protections or modifications of the Confidentiality Order before information designated as confidential is transmitted to Defendants' in-house counsel.

      In sum, the Court should deny Defendants' Joint Motion to Modify the Interim Confidentiality Order. However, in the alternative, Plaintiffs request that the Court implement the proposed limitations and conditions to minimize the risk of inadvertent and harmful disclosures of confidential information.

| | |
|---|---|
| Dated: July 10, 2023 | Respectfully submitted, |
| /s/ Anjelica Sarmiento<br>Anjelica Sarmiento<br>Jessica Weiner<br>Nathan Brenner (IL Bar 6317564)<br>Bureau of Competition<br>Federal Trade Commission<br>600 Pennsylvania Avenue, NW<br>Washington, DC 20580<br>Tel: 202-725-3429<br>Email: asarmiento@ftc.gov<br><br>*Counsel for Plaintiff Federal Trade Commission*<br><br><br>Rachel F. Sifuentes<br>Midwest Regional Office<br>Federal Trade Commission<br>230 S. Dearborn St., Room 3030<br>Chicago, IL 60604<br><br>*Local Counsel for Plaintiff Federal Trade Commission* | /s/ Malinda Lee<br>Malinda Lee<br>Sophia TonNu<br><br>State of California<br>300 S. Spring Street, Suite 1702<br>Los Angeles, CA 90013<br>Tel: 213-269-6223<br>Email: Malinda.Lee@doj.ca.gov<br><br>*Attorneys for Plaintiff State of California*<br><br>/s/ Elizabeth L. Maxeiner<br>Elizabeth L. Maxeiner (IL Bar 6290159)<br>Richard S. Schultz<br>Paul J. Harper<br><br>Office of the Illinois Attorney General<br>100 W. Randolph Street<br>Chicago, IL 60601<br>Tel: 312-814-3000<br>Email: Elizabeth.Maxeiner@ilag.gov<br><br>*Attorneys for Plaintiff State of Illinois*<br><br>/s/ Luminita Nodit<br>Luminita Nodit<br><br>State of Washington<br>800 Fifth Ave., Suite 2000<br>Seattle, WA 98104<br>Tel: 206-254-0568<br>Email: Lumi.Nodit@atg.wa.gov<br><br>*Attorney for Plaintiff State of Washington* |