# Exhibit 2

UNITED STATES SENATE

COMMITTEE ON THE JUDICIARY

SUBCOMMITTEE ON
ANTITRUST, COMPETITION POLICY AND CONSUMER RIGHTS

SENATOR MICHAEL S. LEE, CHAIRMAN


Testimony of

Abbott B. Lipsky, Jr.

Partner, Latham & Watkins LLP
Washington, D.C.

TESTIMONY ON

S. 2102, THE "STANDARD MERGER AND ACQUISITION REVIEWS THROUGH EQUAL RULES ACT OF 2015"

October 7, 2015

Mr. Chairman and Members of the Subcommittee, thank you for your invitation to testify regarding S. 2102, the "SMARTER Act". I am a partner in the law firm of Latham & Watkins LLP, resident in the firm's Washington D.C. office. I am presenting this testimony on my own behalf, based solely on my own experience and understanding of the current Section 7 enforcement process. My views do not necessarily coincide with those of any other individual or entity, including Latham & Watkins LLP or its clients.

I have practiced antitrust law for almost forty years, serving in a variety of government antitrust enforcement and policy positions, including Deputy Assistant Attorney General for Antitrust in the U.S. Justice Department (1981-83), and as the chief global antitrust lawyer for The Coca-Cola Company (1992-2002). I have been active in the ABA Section of Antitrust Law and have held a variety of leadership positions in the Section. I currently serve as Co-Chair of the Section's International Task Force. I also currently serve as Co-Chair of the International Competition Policy Working Group of the U.S. Chamber of Commerce. To reemphasize, however, I am presenting these views on my own behalf, not on behalf of any of these or any other organizations.

Much of my professional experience has involved the antitrust aspects of mergers, acquisitions and joint ventures. During my tenure as Deputy AAG for Antitrust, I was responsible for preparing the 1982 Merger Guidelines under the guidance of Assistant Attorney General William F. Baxter. These Guidelines revolutionized the Antitrust Division's approach to enforcement of Section 7 of the Clayton Act by explicitly incorporating a variety of fundamental economic concepts, criteria and techniques into every step of the merger enforcement process. While there have been several noteworthy modifications to the 1982 Merger Guidelines – specifically in 1984, 1992, 1997 and 2010 – the same fundamental economic approach continues to be followed not only at the Antitrust Division, but also at the Federal Trade Commission and at most antitrust agencies around the world, including scores of agencies that were created as competitive markets and antitrust rules spread worldwide following dissolution of the Soviet Union in 1991.

I have experience in both U.S. district court and administrative litigation, and in contested merger cases not only before the FTC and federal district courts, but also before a number of competition-law agencies in foreign jurisdictions, such as Canada, Chile, China, the E.U., Mexico and Venezuela. I also have experience with agency proceedings involving mergers in many more jurisdictions around the world with actively enforced merger notification and approval regimes.

I previously testified in support of a draft version of the SMARTER Act that was the subject of a hearing before the House Judiciary Committee Subcommittee on Regulatory Reform, Commercial and Antitrust Law in the previous Congress (April 3, 2014), and again before the same House Subcommittee on June 16 of this year. The current version of the SMARTER Act would accomplish a key objective, which is to place the two federal antitrust enforcement agencies on an equal procedural footing when they seek to challenge mergers as anticompetitive. This legislation makes no change in the ultimate substantive antitrust standard applied to transactions subject to Clayton Act Section 7.

PROCEDURAL OPTIONS IN CASES SUBJECT TO CLAYTON ACT SECTION 7

Parties invest significant resources in considering, planning and executing the type of fundamental structural transactions that are subject to Section 7 of the Clayton Act. Time, effort and money are spent studying their strategic logic in light of fundamental business objectives; a variety of consultants (business, marketing and financial strategy) as well as lawyers and accountants are often retained to provide support and analysis, and senior managers and other employees characteristically devote significant effort to considering the merits of the available options. In a significant fraction of such matters, the ability to obtain antitrust clearance in the U.S. and around the world becomes a critical variable. In the United States we must advise business clients on the basis of two independent potential procedural paths. One path runs through the Antitrust Division, with the assessment depending on the potential for a disposition resulting from federal court litigation, while the other runs through the

Federal Trade Commission, which can lead to a variety of potential procedures involving both administrative litigation, court litigation, or various combinations of each.

Because the so-called "clearance" process – the method by which the Antitrust Division of the Department of Justice and the Federal Trade Commission decide which will investigate a particular matter – has no specified rules and therefore no reliably predictable outcome, neither agency can ever be completely ruled out as the possible ultimate reviewer, and therefor none of the procedural pathways can ever be ruled out. While the fundamental legal standard in Section 7 is the same for both agencies and for the courts, the procedural differences can be profound and sometimes dispositive. Where the Antitrust Division is concerned, the parties know that ultimately the matter may be determined by the outcome of litigation in court, including the possibility of appeal. The Antitrust Division has no authority to adjudicate the legality of a transaction: to block a transaction it must persuade a federal district court to issue an order prohibiting or conditioning the transaction and maintain that order through any proceedings in the appellate courts. The Antitrust Division's authority to seek such an order is provided in 15 USC §25.

The procedural options in an FTC merger challenge are more numerous and complex in view of the Commission's option for administrative litigation and the potential interplay between that option and the Commission's judicial options, which are essentially the same as those available to the Antitrust Division. Typically when the FTC challenges a transaction, it will seek a preliminary injunction under 15 USC §53(b) in a federal district court, but I am not aware of any instance in which the Commission has sought a permanent injunction under the authority provided in that section. If the FTC is unsuccessful in its request for a preliminary injunction the Commission may appeal. But regardless of the ultimate outcome in court, the Commission has the option of continuing the challenge through administrative litigation. For most structural transactions this administrative litigation option is the alternative that presents the greatest potential for continuing delay, expense and uncertainty.

Antitrust practitioners have long perceived that the possibility of continued administrative litigation by the FTC following a court decision constitutes a significant disincentive for parties to invest resources in transaction planning and execution. In a matter involving acquisition of the commercial printing firm Meredith Corp. by R. R. Donnelley, first announced in 1989, the Commission's request for preliminary injunction was denied, but the FTC continued to pursue its case in administrative litigation before an administrative law judge (ALJ). The parties sought dismissal of the complaint based on issue preclusion, arguing that the judicial rulings on the Commission's complaint foreclosed further proceedings on that complaint in administrative litigation. This was rejected by the Commission's ALJ on the grounds that the eight-month investigation under the Hart-Scott-Rodino Act followed by the six-day preliminary injunction hearing in court did not provide a sufficient basis to assess the competitive effects of the transaction.

The parties sought review by the full Commission of the ALJ's rejection of their issue-preclusion argument. The Commission refused even to consider the parties' appeal, since according to the Commission its rules of procedure did not allow interlocutory appeal of the ALJ ruling. The parties then sought review of the Commission action in the Seventh Circuit Court of Appeals. In an opinion by Judge Easterbrook, the court dismissed the appeal for lack of jurisdiction (based on lack of a final order), while noting:

> We sympathize with Donnelley's frustration at its inability to get the Commissioners' attention, and we regret the high costs of litigation — especially if the outcome is foredoomed. Members of the public lose along with Donnelley if a protracted case raises the costs of its products.

R. R. Donnelley & Sons v. FTC, 931 F.2d 430, 433 (7th Cir. 1991). At the conclusion of the hearing the ALJ ruled that the transaction would be anticompetitive and ordered divestitures. The parties appealed to the full Commission and, almost six years after the announcement of the transaction, the Commission unanimously overruled the ALJ's initial decision, finding that the transaction was not anticompetitive and therefore did not violate Section 7 of the Clayton Act. 120 F.T.C. 36 (1995).

The Commission has also continued administrative litigation even in cases in which it successfully stopped a proposed transaction in court. This was the situation when the Coca-Cola Company proposed to acquire the Dr Pepper brand in 1985. The FTC conducted an investigation under the Hart-Scott-Rodino Act and obtained an injunction from the federal district court in Washington D.C. *FTC v. Coca-Cola Co.*, 641 F. Supp. 1128 (D.D.C. 1986), *vacated mem.*, 829 F.2d 191 (D.C. Cir. 1987). Although the parties took an immediate appeal to the U.S. Court of Appeals for the D.C. Circuit, shortly thereafter the transaction agreement was terminated by the parties and the Dr Pepper brand was conveyed to an unrelated bidder in a separate transaction. Over the objections of the Commission, the parties to the transaction obtained an order from the U.S. Court of Appeals for the D.C. Circuit declaring the matter moot and remanding with instructions to the district court to vacate the injunction.

Despite the D.C. Circuit's holding that the matter had been rendered moot, the Commission continued the administrative litigation. The case was heard before an administrative law judge, who found the transaction in violation of Section 7 and ordered relief. The ALJ decision on the merits was affirmed on appeal to the Commission. The parties sought review in the D.C. Circuit Court of Appeals. On May 18, 1995 – after years of administrative litigation, and at about the same time as the resolution of the R. R. Donnelley/Meredith litigation – while the Commission's decision was pending on review before the D.C. Circuit, the Commission and Coca-Cola settled the matter, terminating the litigation. Coca-Cola consented to entry of an order requiring prior approval by – or in some cases prior notice to -- the Commission of certain future transactions for ten years following entry of the order. That order expired ten years ago.

The costs, delays and uncertainties inherent in the Commission's pursuit of administrative litigation following judicial disposition of the Commission's merger challenges were probably in the thoughts of Commission leadership when in 1995, shortly after the final disposition of the R. R. Donnelley/Meredith and Coca-Cola/Dr Pepper matters, it adopted the policy statement that has come to be referred to as the

"Pitofsky Rule", after the then-Chairman of the FTC, Robert Pitofsky.[1] On its face the Statement appears to say little of substance. A Commission release that accompanied publication of the Statement offered a spirited defense of the differences between court litigation and administrative litigation. The Commission also reminded practitioners that continuation of administrative litigation following judicial disposition of a Commission injunction request is a matter to be resolved case-by-case on the basis of a public interest determination by the Commission. Arriving as it did in the immediate aftermath of the R. R. Donnelley/Meredith and Coca-Cola/Dr Pepper matters, however, the issuance of this Policy was widely understood to indicate that the Commission had gained a better appreciation of the burden of continuing multi-year administrative litigation following a judicial disposition of a Commission merger challenge. Perhaps the Commission took to heart Judge Easterbrook's sympathetic statement upon dismissal of the parties' interlocutory appeal in Donnelley/Meredith.

The "Pitofsky Rule" – embodied in a specific provision of the Commission's Rules of Practice, 16 CFR §3.26 – was largely followed by the Commission in subsequent merger cases involving a Commission loss on motion for preliminary injunction in the district court. There were proposals for major revisions in the rules of practice for FTC administrative litigation in 2008, however, that reversed the rule and its unspoken presumption (among many other features) and establish a regular practice of placing merger cases in administrative litigation even where the Commission's injunction request had failed in court.[2] However, the FTC very recently took steps that would seem to at least partially restore the original understanding of the Pitofsky Rule.[3] Like

---

[1] Statement of Federal Trade Commission Policy Regarding Administrative Merger Litigation Following the Denial of a Preliminary Injunction. 60 Fed. Reg. 39743 (August 3, 1995).

[2] 16 CFR Parts 3 and 4 Rules of Practice; Proposed Rules, 73 Fed. Reg. 58832 (proposed Oct. 7, 2008); see N. Stoll and S. Goldfein, "Random Events in Merger Notices: 'Cleared to DOJ' vs. 'Cleared to FTC'", 240 N.Y.L.J. (Dec. 16, 2008).

[3] Changes to Commission Rule 3.26 re: Part 3 proceedings following federal court denial of a preliminary injunction (March 16, 2015), available at https://www.ftc.gov/news-events/blogs/competition-matters/2015/03/changes-commission-rule-326-re-part-3-proceedings (visited June 12, 2015).

the first such Statement, however, the more recent one says little of substance, but it does seem to suggest that the Commission will take seriously the possibility of dropping merger cases – or at least the possibility of further administrative litigation – where it has been unable to obtain preliminary relief in court.

The SMARTER Act is, fundamentally, a codification of the Commission's generally sound practice over the past twenty years (ignoring the apparent 2008 deviation), consistent with the original if largely unstated understanding surrounding the Pitofsky Rule. It will channel the Federal Trade Commission's merger challenges through federal district court, rather than through administrative litigation, as the Commission itself has chosen to do. In combination with the proposed restoration of equality in the standards for grant of injunctive relief, it will eliminate the troublesome divergence in the procedures available to each agency, and it will most notably eliminate the specter of additional years-long administrative litigation before the Commission for transactions that have been challenged before the federal district courts. This would be a welcome and salutary adjustment in the procedures applicable to structural transactions, and may enhance the options available to businesses that are anxious to conform their behavior to the antitrust laws. Ultimately, consumers will benefit from the resulting productivity enhancement.

STANDARDS FOR GRANT OF PRELIMINARY RELIEF

The need to restore equality between the preliminary injunction standards applicable to both FTC and Antitrust Division cases challenging transactions subject to Clayton Act Section 7 emerges from a series of recent merger cases that has created an apparent gap in the applicable standards for grant of preliminary relief. The Antitrust Division's authority to seek a injunctions (preliminary and permanent) in Clayton Act cases is found in 15 USC §25. The applicable standard has long been understood to incorporate a sliding scale involving likelihood of success and an assessment of equitable factors, most notably the public interest. Although the wording of specific decisions can suggest subtle differences in approach from case to case, the logic of this standard is not difficult to understand. Once a structural transaction is consummated, it

can becomes more costly and difficult to restore the *status quo ante* if it is determined that the transaction was likely to reduce competition substantially or create monopoly in a defined relevant market. Thus a preliminary injunction can serve the salutary purpose of suspending the transaction while its legality is assessed on the merits, so that it can be prohibited if it is proven to be illegal.

But the suspension of a transaction pending an assessment of its legality under Section 7 carries risk. The delay, cost, uncertainty and inconvenience of proceedings may cause the parties to abandon the transaction. If it turns out that the transaction was erroneously enjoined, the consumer suffers. Even if the transaction ultimately goes through, the consumer foregoes some or possibly all of its competitive benefits, at least for a time, and indirectly pays the cost of that mistake through higher prices necessary to cover the extra cost. Therefore broadly speaking the purpose of the preliminary injunction standard is to require a sensible balancing of the risks – to stop anticompetitive mergers and prevent harm, if the transaction is truly anticompetitive, and to assure that procompetitive mergers are consummated as soon as possible consistent with making a sensible judgment that they are not anticompetitive.

The Commission's authority to seek a preliminary injunction is based on 15 USC §53(b), and was intended by Congress to require this same sliding scale assessment. A transaction with a high risk of illegality usually ought to be enjoined since there is less fear that litigation will impose needless costs and delays. But a transaction with a low risk of illegality should not be enjoined, lest it be deterred or mistakenly terminated due to the burden of proceedings. The cumulative effect of several recent contested merger decisions has been to allow the FTC to argue that it needn't show likelihood of success in order to win a preliminary injunction; specifically these decisions suggest that the Commission need only show "serious, substantial, difficult and doubtful" questions regarding the merits.

I realize that the cases supply fodder for a much longer and more detailed analysis of the definition and application of these preliminary injunction standards. That would be unnecessary, however, because this subcommittee and other committees of

9

Congress have received testimony on other occasions that engage in a much more extended analysis of legislative history and the recent case law in demonstrating the unintended emergence of this gap. For example, as former FTC Chair Tim Muris has testified before a Senate Subcommittee:

> Unfortunately, a few recent court decisions provide the FTC with a lower preliminary injunction standard than the standard for the DOJ. Because of this lower standard, it is now possible for the FTC to obtain a preliminary injunction to block a merger with evidence that would be insufficient for the DOJ to obtain the injunction. Because most preliminarily enjoined deals cannot, as a practical matter, survive the months (much less years) of delay attendant upon an FTC administrative proceeding, the FTC's relative ease in obtaining a preliminary injunction means that it can permanently foreclose more mergers than its counterpart.
>
> This result is fundamentally unfair. Because the FTC and DOJ divide merger review between them pursuant to an *ad hoc* agreement, the legality of some mergers today depends not on their underlying merits, but instead on which agency reviews them. In other words, the flip of a coin (to resolve a dispute between the two agencies over which agency should review the merger) could determine whether a merger survives antitrust scrutiny.[4]

Thus, there is a distinct need to return the preliminary injunction standards applied to merger challenges by the two distinct federal antitrust agencies to a state of equality, and that means a restoration of the FTC standard to its original level, equivalent to the standard applied to the Antitrust Division – namely, the traditional injunction standard, applying what is in essence a sliding scale that considers both likelihood of success on the merits and an assessment of the equities, and primarily the public interest. The present bill seems to achieve both objectives in a direct and simple manner, and for all of these reasons I support passage of the bill.

---

[4] Financial Services and Products: The Role of the Federal Trade Commission in Protecting Consumers, Statement of Timothy J. Muris, Foundation Professor, George Mason University School of Law, and of counsel, O'Melveny & Myers LLP, before the U.S. Senate, Committee on Commerce, Science and Transportation, Subcommittee on Consumer Protection, Product Safety and Insurance, Washington, D.C., March 17, 2010.