# Exhibit A

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| FEDERAL TRADE COMMISSION, STATE OF CALIFORNIA, STATE OF ILLINOIS, STATE OF MINNESOTA, STATE OF NEW YORK, STATE OF WASHINGTON and STATE OF WISCONSIN, <br><br> *Plaintiffs*, <br><br> v. <br><br> AMGEN INC. and HORIZON THERAPEUTICS PLC, <br><br> *Defendants*. | Case No. 1:23-cv-03053 <br><br> Judge John F. Kness |

**BRIEF FOR THE CHAMBER OF COMMERCE**
**OF THE UNITED STATES OF AMERICA AND**
**THE NATIONAL ASSOCIATION OF MANUFACTURERS AS**
**AMICI CURIAE IN SUPPORT OF DEFENDANTS'**
**OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

**TABLE OF CONTENTS**

INTEREST OF AMICI CURIAE ................................................................................ 1

SUMMARY OF THE ARGUMENT .......................................................................... 1

ARGUMENT .............................................................................................................. 4

I.      The FTC Should Not Be Permitted to Block Mergers Based on Hypothetical or Highly Speculative Assertions of Future Anticompetitive Effects. ................... 4

        A.      The FTC relies on a highly speculative theory of potential anticompetitive effects. ................................................................................... 5

        B.      The FTC's highly speculative theory cannot satisfy its burden under Section 7 of the Clayton Act. ................................................................. 8

        C.      The FTC's attempt to circumvent its burden is unsupported by modern antitrust doctrine. ................................................................................... 9

II.     The FTC Should Not Be Permitted to Block Mergers Without Accounting for Procompetitive Effects. ....................................................................................... 13

III.    The FTC's Legal Theories Would Harm Competition and Consumers .......................... 14

CONCLUSION ........................................................................................................ 15

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Atl. Richfield Co. v. USA Petroleum Co.*,
  495 U.S. 328 (1990)............................................................................................................11

*Cascade Health Sols. v. PeaceHealth*,
  515 F.3d 883 (9th Cir. 2008) .......................................................................................6, 11

*FTC v. Elders Grain, Inc.*,
  868 F.2d 901 (7th Cir. 1989) ............................................................................................8

*FTC v. Great Lakes Chem. Corp.*,
  528 F. Supp. 84 (N.D. Ill. 1981) ......................................................................................8

*FTC v. Microsoft Corp.*,
  2023 WL 4443412 (N.D. Cal. July 10, 2023)..............................................................5, 12

*FTC v. Procter & Gamble Co.*,
  386 U.S. 568 (1967)..........................................................................................................10

*FTC v. Tenet Health Care Corp.*,
  186 F.3d 1045 (8th Cir. 1999) ......................................................................................8, 14

*FTC v. Univ. Health, Inc.*,
  938 F.2d 1206 (11th Cir. 1991) .......................................................................................13

*Gen. Foods Corp. v. FTC*,
  386 F.2d 936 (3d Cir. 1967)..............................................................................................10

*In re Illumina, Inc.*,
  FTC Docket No. 9401, 2023 WL 2823393 (Mar. 31, 2023) ...................................12

*Kennecott Copper Corp. v. FTC*,
  467 F.2d 67 (10th Cir. 1972) ...........................................................................................10

*Tenneco, Inc. v. FTC*,
  689 F.2d 346 (2d Cir. 1982)...............................................................................................9

*United States v. AT&T Inc.*,
  310 F. Supp. 3d 161 (D.D.C. 2018) ...................................................................................6

*United States v. AT&T, Inc.*,
  916 F.3d 1029 (D.C. Cir. 2019) ...............................................................................3, 8, 9

*United States v. ITT Corp.*,
    324 F. Supp. 19 (D. Conn. 1970) ..........................................................................10

*United States v. Marine Bancorporation, Inc.*,
    418 U.S. 602 (1974) ..............................................................................................8

*United States v. United States Sugar Corp.*,
    2022 WL 4544025 (D. Del. Sept. 28, 2022), *aff'd*, 73 F.4th 197 (3d Cir. 2023) ....................8

**Statutes**

Clayton Act Section 7, 15 U.S.C. § 18 ................................................................ *passim*

**Other Authorities**

Conglomerate effects of mergers—Note by the United States, OECD Directorate
    for Fin. & Enter. Affairs Competition Comm. (June 10, 2020) ......................................2, 9, 11

Dep't of Justice & FTC, Merger Guidelines Draft for Public Comment (July 19,
    2023) ..................................................................................................................14

Duxin Sun et al., *Why 90% of Clinical Drug Development Fails and How to
    Improve It?*, 12 Acta Pharm Sin B. 3049 (Feb. 2022) ..............................................5

Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust
    Principles and Their Application* (Fourth and Fifth Editions, 2023 Cum. Supp.
    2016–2022) ........................................................................................................11

Robert H. Bork, *The Antitrust Paradox* (1978) ..........................................................11

**INTEREST OF AMICI CURIAE**

The Chamber of Commerce of the United States of America (the "Chamber") is the world's largest business federation. It represents approximately 300,000 direct members and indirectly represents the interests of more than three million companies and professional organizations of every size, in every industry sector, and from every region of the country. An important function of the Chamber is to represent the interests of its members in matters before Congress, the Executive Branch, and the courts. To that end, the Chamber regularly files amicus curiae briefs in cases, like this one, that raise issues of concern to the Nation's business community.

The National Association of Manufacturers (the "NAM") is the largest manufacturing association in the United States, representing small and large manufacturers in all 50 states and in every industrial sector. Manufacturing employs nearly 13 million men and women, contributes $2.91 trillion to the U.S. economy annually, has the largest economic impact of any major sector, and accounts for over half of all private-sector research and development in the nation. The NAM is the voice of the manufacturing community and the leading advocate for a policy agenda that helps manufacturers compete in the global economy and create jobs across the United States.

The Chamber and the NAM have a significant interest in preventing the government from pursuing overly aggressive approaches to mergers that would allow the government to enjoin procompetitive mergers based on speculative harms. If the Federal Trade Commission ("FTC") is permitted to succeed on such a standard, the government could block any merger based on little more than hypotheticals, introducing uncertainty and casting doubt on any number of mergers that benefit consumers. Amici thus have a significant interest in the proper resolution of this case.

**SUMMARY OF THE ARGUMENT**

In seeking to block Amgen Inc.'s proposed acquisition of Horizon Therapeutics plc, the FTC asserts that it can use Section 7 of the Clayton Act to block mergers based on hypothetical

harms while ignoring tangible benefits. The FTC relies on outdated economic theories and half-century-old precedent to support this assertion, and it casts aside key intervening precedent and developments in economics. If the FTC were permitted to succeed on such a theory, the government could hypothesize potential anticompetitive harms to enjoin practically any merger—notwithstanding the existence of provable procompetitive benefits. Such a standard would serve only to block and to chill beneficial merger activity. This is not the law. Amici urge this court to stop the FTC from attempting singlehandedly to rewrite binding precedent.

Mergers are commonplace throughout the economy and are consistently recognized as a source of efficiencies. Indeed, many mergers are procompetitive and result in efficiency gains that are otherwise unachievable absent the merger. For example, the FTC previously has recognized that "a merged firm that control[s] the production and distribution of complements may be able to create innovative benefits from using the products together in ways that would have been hard to achieve though arm's-length contracts."[1]

Amgen and Horizon propose a merger that they believe will generate such benefits. *See* Answer 1–2, ECF No. 77. The merging parties offer complementary products and services—pharmaceutical products that treat different conditions and the corporate infrastructure and experience necessary to deliver those products to patients. *Id.* The companies contend that by combining Horizon's treatments—principally two unique FDA-approved medicines for thyroid eye disease ("TED") and chronic refractory gout ("CRG")—with Amgen's infrastructure, they will be able to deliver more medicines to more of the patients who will benefit from them. *Id.*

---

[1] Conglomerate effects of mergers—Note by the United States, OECD Directorate for Fin. & Enter. Affairs Competition Comm. 3 (June 10, 2020), https://www.ftc.gov/system/files/attachments/us-submissions-oecd-2010-present-other-international-competition-fora/oecd-conglomerate_mergers_us_submission.pdf ("Conglomerate Effects").

Remarkably, the FTC seeks to enjoin the merger even though it recognizes that Amgen and Horizon are not horizontal competitors in any market, and that their merger will not increase market concentration. Instead, the FTC's arguments are based wholly on speculative assertions that new competitors to Horizon's products might gain regulatory approval at some undetermined time in the future (no competitor drugs exist currently); that Amgen might respond by engaging in discounting practices (which Amgen has committed not to use); that the discounts might make it more difficult for the rivals to succeed in the marketplace; and that the hypothetical anticompetitive effects of such foreclosure might ultimately outweigh the actual procompetitive benefits of the merger. *See* Pls.' Mem. Supp. Prelim. Inj. 10, ECF No. 106 ("FTC Br.").

Because mergers often have procompetitive benefits, Section 7 of the Clayton Act imposes a substantial burden of proof on the FTC before it can invoke the power of the federal courts to block a merger. The law requires the FTC to make a showing that goes well beyond mere speculation of potential harm. The government must instead make a "fact-specific" showing that the proposed merger is "likely to be anticompetitive," where, as here, the challenged merger does not affect market concentration. *United States v. AT&T, Inc.*, 916 F.3d 1029, 1032 (D.C. Cir. 2019). Moreover, courts must consider a merger's potential procompetitive benefits. The FTC here suggests a standard for evaluating procompetitive efficiencies that would have the practical effect of making those efficiencies irrelevant to a court's consideration of a motion for a preliminary injunction. But that suggestion contradicts well established precedent that procompetitive effects must be considered when evaluating a merger's potential effects. *See id.* at 1037 (applying standard assessing "whether, *notwithstanding the proposed merger's conceded procompetitive effects*, the government has met its burden of establishing . . . that the merger . . . is likely to substantially lessen competition" (emphasis added)).

The FTC's attempt to rely on hypothetical harms and ignore clear procompetitive effects risks blocking mergers where procompetitive effects outweigh any potential competitive harms. The harm to the economy of such a standard would be much broader than reducing the availability of the specific pharmaceutical products at issue in this case. If the FTC's standards were adopted, nearly every merger, no matter how small, could be subject to a challenge and injunction. The FTC's theory is designed to chill a wide range of procompetitive activity, and, in so doing, will harm businesses, the economy, and consumers. Amici urge this Court to reject it.

## ARGUMENT

I.  **The FTC Should Not Be Permitted to Block Mergers Based on Hypothetical or Highly Speculative Assertions of Future Anticompetitive Effects.**

The FTC's theory of competitive harm relies on a multiplicity of assumptions, speculation, and hypotheticals. Although Amgen and Horizon both develop, manufacture, and distribute drugs, the FTC does not allege that the merger would combine horizontal competitors or that it would increase market concentration. Instead, the FTC suggests that the proposed merger could permit Amgen, at some point in the future, to leverage its "portfolio of blockbuster drugs" to gain advantages over theoretical future rivals for Horizon's innovative medicines that treat TED (Tepezza) and CRG (Krystexxa). FTC Br. 10. In particular, the FTC relies on counterintuitive speculation that Amgen purportedly could offer a cross-market bundle, in which it offers lower prices on its existing portfolio of popular drugs to "secure preferred access for Tepezza and Krystexxa" with health plans and pharmacy benefit managers ("PBMs"), and that this conduct could undermine attempts by hypothetical future competitors to grow their share in the markets for the treatment of TED and CRG. FTC Br. 17. The FTC points to no facts in support of its theory and instead relies on layers of speculation and hypotheticals to paper over its lack of facts.

### A.      The FTC relies on a highly speculative theory of potential anticompetitive effects.

The FTC's claims in this case rely on a theory that is at best indirect, speculative, and inconsistent with the parties' incentives and commitments.  It relies on at least the following steps:

*First*, as the FTC notes, Tepezza and Krystexxa are currently the only FDA-approved drugs for the treatment of TED and CRG.  FTC Br. 11, 14.  Any potential competitor would initially need to obtain approval from the FDA at some undefined point in the future, a notoriously difficult process in which even drugs that show promise in early-stage clinical trials often fail.  *See, e.g.*, Duxin Sun et al., *Why 90% of Clinical Drug Development Fails and How to Improve It?*, 12 Acta Pharm Sin B. 3049, 3049–3062 (Feb. 2022), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC9293739.

*Second*, Amgen would need to choose to include Tepezza and Krystexxa in bundled discounts, despite Amgen's express commitment not to do so—a commitment Amgen offers to memorialize in a consent order—and the lack of evidence that Amgen plans to include either drug within a bundle.  Answer 2–3.[2]  The FTC responds to Amgen's commitment by speculating that Amgen might surreptitiously "circumvent" its binding commitment by entering into "'handshake' agreements with PBMs/GPOs."  FTC Br. 33–34.  However, the Commission's rejection of Amgen's offer to enter into a binding consent order as evidence of Amgen's intent, especially where it can point to no internal documents contradicting Amgen's commitment, finds no support in the law; Amgen's commitments inform its intent and should be given weight.  *See, e.g.*, *FTC v. Microsoft Corp.*, 2023 WL 4443412, at *13–14 (N.D. Cal. July 10, 2023) (finding that Microsoft's

---

[2] Notably, the FTC does not explain why it would be profitable for Amgen to offer discounts on its broadly distributed current line of products to obtain greater sales of Horizon's admittedly niche products.  Nor does it address the dynamics of treating serious, rare conditions, in which the strong preferences of doctors and patients—not formulary decisions—drive utilization.  Answer 4–5.

public commitment to refrain from the allegedly anticompetitive conduct indicated a lack of incentive to engage in the conduct); *see also United States v. AT&T Inc.*, 310 F. Supp. 3d 161, 169 n.3 (D.D.C. 2018) (quoting government statement from a different case recognizing that in certain cases conduct remedies "'can be a very useful tool to address the competitive problems while preserving competition and allowing efficiencies' that 'may result from the transaction'").

*Third*, the hypothetical future competitors to Amgen would have to be unable to compete by offering discounts of their own. Notably, there is nothing inherently anticompetitive about offering bundled discounts; courts recognize that "[b]undled discounts generally benefit buyers because the discounts allow the buyer to get more for less." *E.g.*, *Cascade Health Sols. v. PeaceHealth*, 515 F.3d 883, 895 (9th Cir. 2008). As a result, the relevant inquiry is not whether the merged party would offer such discounts, but whether such discounts would foreclose equally efficient competitors from competing, for example by discounting below cost. *See id.* at 909. Here, the FTC must ignore Amgen's express commitments even to hypothesize that Amgen would bundle either of Horizon's drugs, much less to conclude that its hypothetical bundled discounts would foreclose other competitors. And it must further hypothesize that Amgen's potential competitors will not respond with beneficial price competition, for example by offering their own discounts.

*Fourth*, the FTC speculates that Amgen would continue to have "blockbuster drugs that it can leverage to gain anticompetitive advantages," FTC Br. 10, at the undetermined future time at which new entrants might enter the market. The FTC therefore speculates on the one hand that Amgen's existing products will be protected by high barriers to entry because obtaining FDA approval is highly challenging, *see id.* at 27, while speculating on the other hand that Horizon's products will face competition from products that have not yet obtained such approval.

*Fifth*, the kind of product bundling on which the FTC relies typically involves discounts applicable to a portfolio of different medicines that all are reimbursed by pharmacy benefit plans. *See* FTC Br. 17–18.  But Horizon's drugs are primarily reimbursed under payers' *medical* benefits, whereas Amgen's most successful products are reimbursed under payers' *pharmacy* benefits.  *See id.* at 29–30; Answer 4.  Amgen does not have any contracts that bundle medical and pharmacy benefits, which means that the hypothesized bundled discounts on which the FTC relies have no precedent in Amgen's business practices.  Answer 4.  To overcome this mismatch between facts and theory, the FTC engages in a hodge-podge of further speculation that either (i) Amgen might enter into an unprecedented cross-benefit bundle or (ii) Amgen will develop and obtain regulatory approval for self-administered versions of Krystexxa and Tepezza that would be reimbursed as a pharmacy benefit, and then that competitors might also successfully develop and obtain FDA approval for competitor versions.  FTC Br. 28–31.

In sum, the FTC's theory of anticompetitive harm requires that: (i) competitor products to both Tepezza and Krystexxa will succeed in their clinical trials and receive FDA approval; (ii) Amgen will respond to the prospective entry by including Tepezza and Krystexxa in a bundle, despite Amgen's express commitment to refrain from bundling Horizon's drugs; (iii) hypothetical competitors to Amgen will not be able to offer discounts of their own; (iv) Amgen's existing drugs—unlike Horizon's—will not face new entry; and (v) to offer a bundled discount, Amgen will either develop new versions of the drugs that are reimbursed as pharmacy benefits or engage in unprecedented cross-benefit bundling.  And even if all of that speculation is accepted, the FTC still has not specified how the result would be a reduction in *competition*.  The Commission cannot explain how even its speculative theory would cause such a significant effect on the market as to make entry impractical, and even one break in the FTC's speculative causal chain would

7

undermine the FTC's entire premise of harm. To allow the FTC to invent infeasible harms to justify its actions here would put nearly every merger at risk.

**B.     The FTC's highly speculative theory cannot satisfy its burden under Section 7 of the Clayton Act.**

Under these facts, the FTC cannot satisfy its legal burden. Section 7 prohibits mergers whose effect "may be substantially to lessen competition, or to tend to create a monopoly." 15 U.S.C. § 18. Merger challenges are reviewed under a burden-shifting framework, under which the government must establish a prima facie case that the proposed merger is anticompetitive by "(1) identify[ing] the proper relevant market and (2) show[ing] that the effects of the merger are likely to be anticompetitive." *United States v. United States Sugar Corp.*, 2022 WL 4544025, at *19 (D. Del. Sept. 28, 2022), *aff'd*, 73 F.4th 197 (3d Cir. 2023). To receive a preliminary injunction, "the FTC must raise questions going to the merits so serious, substantial, difficult and doubtful as to make them fair ground for thorough investigation, study, deliberation and determination." *FTC v. Tenet Health Care Corp.*, 186 F.3d 1045, 1051 (8th Cir. 1999) (quoting another source).

Although Section 7 prohibits mergers that may substantially lessen competition, even the precedent on which the FTC relies has cautioned that "the word 'may' should not be taken literally, for if it were, every acquisition would be unlawful." *FTC v. Elders Grain, Inc.*, 868 F.2d 901, 906 (7th Cir. 1989); *see also United States v. Marine Bancorporation, Inc.*, 418 U.S. 602, 622–23 (1974) ("[Section] 7 deals in 'probabilities,' not 'ephemeral possibilities.'" (citing *Brown Shoe Co. v. United States*, 370 U.S. 294, 323 (1962))). The FTC cannot meet its burden by relying on hypotheticals and the "mere possibility" of competitive harm; it must instead show that the merger has a "reasonable probability" of causing anticompetitive effects. *See United States v. AT&T, Inc.*, 916 F.3d 1029, 1032 (D.C. Cir. 2019); *see also FTC v. Great Lakes Chem. Corp.*, 528 F. Supp.

84, 86 (N.D. Ill. 1981) ("The Government must prove not that the merger in question may possibly have an anti-competitive effect, but rather that it will probably have such an effect." (quoting *United States v. Amsted Indus., Inc.*, 1972 WL 544, at *2 (N.D. Ill. Feb. 3, 1972))).

For a horizontal merger where the asserted anticompetitive effect derives from an increase in market concentration, the government may in some cases be able to rely on statistical evidence of market concentration as a "short cut" to demonstrate anticompetitive effects. But this presumption is not available where, as here, the proposed merger does not involve an increase in market concentration. *See AT&T*, 916 F.3d at 1032 (citing Dep't of Justice & FTC, Non-Horizontal Merger Guidelines § 4.0 (June 14, 1984)); *see also* Conglomerate Effects at 4 ("For vertical and conglomerate mergers, no such presumption is available because such mergers do not involve an increase in market concentration.").

For mergers that do not threaten to increase post-merger market concentration, the FTC must instead make a "fact-specific" showing that the proposed merger is "likely to be anticompetitive." *AT&T*, 916 F.3d at 1032. "[S]peculation does not provide an adequate basis for a finding of a section 7 violation." *Tenneco, Inc. v. FTC*, 689 F.2d 346, 354 (2d Cir. 1982); *see also AT&T*, 916 F.3d at 1045 (affirming district court findings discounting testimony that "rested on speculative, future predictions and lacked adequate factual support").

Thus, to enjoin the proposed merger, the FTC must make a showing that goes well beyond hypothetical potential harm; it must offer "fact-specific," non-speculative evidence that the merger is anticompetitive. This is precisely what the FTC's speculative theory fails to do.

### C.     The FTC's attempt to circumvent its burden is unsupported by modern antitrust doctrine.

Instead of relying on specific facts or widely recognized and accepted modern judicial decisions, the FTC invokes outdated theories of competitive harm and its own internal precedents.

These attempts to shortcut Section 7's standards are unsupported by the law and, if accepted, would risk widespread economic harm. They would not only permit the FTC to block procompetitive mergers, but also would chill merger activity generally and discourage companies from pursuing the benefits to the economy that many mergers generate. Moreover, as applied here, neither of the FTC's theories of anticompetitive harm are sufficient to show a likelihood that the merger will have a substantial effect on competition.

*First*, the FTC seeks to invoke an archaic "entrenchment theory" to suggest that it could harm competition if Amgen were to become a more formidable market participant by combining Horizon's successful products with Amgen's substantial infrastructure. Initially discussed by the Supreme Court in *FTC v. Procter & Gamble Co.*, 386 U.S. 568 (1967), the entrenchment theory was utilized in the 1960s and 1970s to demonstrate the allegedly harmful effects of conglomerate mergers. Although a handful of courts accepted the entrenchment theory in the aftermath of *Procter & Gamble*, *see, e.g.*, *Gen. Foods Corp. v. FTC*, 386 F.2d 936, 946 (3d Cir. 1967); *Kennecott Copper Corp. v. FTC*, 467 F.2d 67, 75–79 (10th Cir. 1972); *United States v. ITT Corp.*, 324 F. Supp. 19, 24 (D. Conn. 1970), these cases demonstrate the economic backwardness of the doctrine. For example, in *General Foods*, the court found that it might be anticompetitive for "a large, well-finance[d], aggressive competitor" to enter a market because other companies might decide that such an aggressive competitor would "increase[] the difficulty" of competing in the market. 386 F.2d at 946; *see also ITT Corp.*, 324 F. Supp. at 24 (holding that it could be harmful for a company to obtain "marketing and promotional competitive advantages" from a merger).

Beginning in the mid-1970s, the academic consensus repudiated the theory. For example, Robert Bork explained that conglomerate mergers are generally procompetitive and generate efficiencies, as increased competition from a large competitor forces smaller competitors "to

improve, rather than worsen, their competitive performance." Robert H. Bork, *The Antitrust Paradox* 256–57 (1978). One of antitrust's leading commentators similarly has criticized this period of conglomerate merger policy because of its "tendency to permit almost unrestrained speculation about future possibilities to guide its analysis . . . . The result was that many undoubtedly socially beneficial mergers were condemned because of postulated concerns about competition that would never have materialized." Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* ¶ 1120 (Fourth and Fifth Editions, 2023 Cum. Supp. 2016–2022). Eventually, even antitrust regulators came to criticize the entrenchment theory as a relic of a prior era. As recently as June 2020, both the FTC and U.S. Department of Justice ("DOJ") recognized that the entrenchment theory was "no longer viewed as valid under U.S. law or economic theory" as it is "antithetical" to the "core values that antitrust laws protect competition, efficiency, and consumer welfare rather than individual competitors." Conglomerate Effects at 4.

The FTC was right in 2020 and wrong in 1970 (and today). "The antitrust laws were enacted for 'the protection of *competition*, not *competitors*.'" *Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 338 (1990) (citation omitted). As a result, the strong presumption is that antitrust law does not protect businesses from the potential that they will face "nonpredatory price competition"—including bundled discounting—as "cutting prices in order to increase business often is the very essence of competition." *Id.* (citation omitted); *see also Cascade Health*, 515 F.3d at 901–03. The FTC should not be permitted to resurrect any antitrust theory reliant on speculative harm arising from competitors that are too formidable.

*Second*, and in the absence of any non-speculative facts indicating that the proposed merger is likely to be anticompetitive, the FTC suggests that it can meet its burden by using a new shortcut,

demonstrating that the post-merger firm would have the "ability and incentive" to disadvantage potential rivals. FTC Br. 17. The FTC suggests that the combined Amgen-Horizon entity would possess both elements because the post-merger entity would: (i) be able to leverage its portfolio of blockbuster drugs to "secure preferred access for Tepezza and Krystexxa" and (ii) have a "strong incentive" to protect the value of Horizon's products. *Id.*

In support of this legal theory, the FTC relies primarily on its own administrative decision in *Illumina*. FTC Br. 17 (citing *In re Illumina, Inc.*, FTC Docket No. 9401, 2023 WL 2823393 (Mar. 31, 2023)). But that theory has been rejected in federal court. *See Microsoft*, 2023 WL 4443412, at *12. In *Microsoft*, as here, the FTC attempted to rely on its own *Illumina* opinion to establish that it need only show that the merging parties had both the ability and incentive to foreclose competition. The court rejected that theory, determining that ability and incentive to foreclose competition were mere prerequisites to demonstrating an anticompetitive effect. *Id.* ("If there is no incentive to foreclose, then there is no probability of foreclosure and the alleged concomitant anticompetitive effect. Likewise, if there is no ability, then a party's incentive to foreclose is irrelevant."). But "[i]t is not enough that a merger might lessen competition—the FTC must show the merger will probably *substantially* lessen competition." *Id.* at *13. Thus, demonstrating that the merged entity would possess the ability and incentive to potentially engage in anticompetitive conduct—without more—does not relieve the FTC of its burden to prove that the proposed merger *actually would* likely *substantially* lessen competition. The FTC lacks a non-speculative basis from which it could meet that burden here.

The Court should not permit the FTC to shirk its burden by relying on either an "entrenchment theory" or its own "ability and intent" test as a shortcut to demonstrate that the merger will probably result in a substantial lessening of competition. Accepting either of these

12

tests would be a fundamental shift in antitrust law that ignores decades of economic research and antitrust precedent and—as detailed in Section III, below—would impose substantial market-wide harms by blocking and chilling procompetitive merger activity.

## II. The FTC Should Not Be Permitted to Block Mergers Without Accounting for Procompetitive Effects.

The FTC's speculation that the merger could result in potentially anticompetitive effects comes at the expense of the transaction's very real procompetitive benefits. The merger would combine Amgen, one of the world's largest biopharmaceutical companies, Compl. ¶ 1, ECF No. 7, and Horizon, a smaller biotechnology company that focuses on the treatment of rare, autoimmune, and severe inflammatory diseases, *id.* ¶ 26. The transaction joins Amgen's experience in commercial operations, including its "access, medical, patient support, and overall scale and expertise in marketing and sales" with Horizon's therapeutics that target rare diseases. Answer 40. The parties have explained that the combined firm will be able to more efficiently manufacture and distribute Horizon's drugs, resulting in cost-savings. *Id.* at 2, 40–41. Patients will likewise benefit from the transaction's potential to develop new, innovative drug and device combinations. *Id.* at 40.

The FTC suggests that the Court should ignore these procompetitive merger effects because these efficiencies can never "immunize an otherwise anticompetitive merger." FTC Br. 32. This position ignores the text of Section 7 of the Clayton Act, which prohibits mergers only where "the effect . . . may be substantially to lessen competition." 15 U.S.C. § 18. Multiple circuits have thus recognized the importance of incorporating merger-specific efficiencies in the analysis. *See, e.g., FTC v. Univ. Health, Inc.*, 938 F.2d 1206, 1222 (11th Cir. 1991) ("whether an acquisition would yield significant efficiencies in the relevant market is an important consideration in predicting whether the acquisition would substantially lessen competition" and "evidence that

13

a proposed acquisition would create significant efficiencies benefiting consumers is useful in evaluating the . . . acquisition's overall effect on competition"); *Tenet*, 186 F.3d at 1054 ("the district court should nonetheless have considered evidence of enhanced efficiency in the context of the competitive effects of the merger"). Even the FTC and DOJ's recent draft merger guidelines continue to recognize that procompetitive efficiencies should be considered when evaluating a merger. *See* Dep't of Justice & FTC, Merger Guidelines Draft for Public Comment 33–34 (July 19, 2023), https://www.justice.gov/d9/2023-07/2023-draft-merger-guidelines_0.pdf.

Moreover, considering only the anticompetitive effects of a proposed merger, while ignoring the procompetitive benefits, would provide a plainly inaccurate assessment of a merger's overall effect on competition and risks improperly condemning any number of procompetitive mergers. It is especially important to analyze carefully the competitive effects of a merger where, as here, the parties are not direct horizontal competitors, and the proposed anticompetitive effects are speculative. Any other test would only accentuate the risk of false-positive results in which procompetitive mergers are blocked, an outcome directly contrary to the goals of the antitrust laws.

## III. The FTC's Legal Theories Would Harm Competition and Consumers

Most mergers are procompetitive. An even larger share of non-horizontal mergers pose no competitive threats. And in this case, the FTC's speculative theory of harm is undone by common sense and the parties' clear commitments not to engage in the only conduct the FTC even claims could harm competition.

The FTC's legal theory for why such a merger should be barred is extreme. It claims that hypothetical harm is sufficient, no matter how speculative. It asserts that procompetitive benefits are irrelevant, no matter how concrete. And the FTC thus, in effect, claims for itself the sole power to determine which mergers to permit and which to prohibit. The FTC's approach would undermine the core goals of antitrust policy—if adopted, the theory's myopic focus on

hypothetical anticompetitive effects of a merger would undermine competition, harm the Chamber's and the NAM's members, and ultimately hurt consumers.

The FTC's overbroad theory in this case has the most immediate implications for the pharmaceutical industry, where the FTC could rely on the speculative theories of harm expressed here and the entrenchment theory to block any transaction where the potential for bundling exists, regardless of whether the transaction is procompetitive. Should the FTC succeed, it would chill merger activity, depriving patients of the associated innovation and efficiencies. Makers of promising early-stage drugs may instead find themselves held up in the pipeline, unable to move forward without the relevant expertise or necessary capital to bring those drugs to market.

Beyond the pharmaceutical industry, the FTC's actions would have far-reaching consequences for the merger of any companies that could potentially offer complementary bundled products post-merger. As this case demonstrates, there is little that merging parties could do to assuage the FTC; even express commitments to refrain from the conduct the FTC finds concerning are insufficient in the FTC's view. Cumulatively, the FTC's theories, should they be permitted to stand, introduce uncertainty for businesses contemplating even the most procompetitive of mergers and will have a chilling impact on potential procompetitive transactions. Nothing in Section 7 countenances that result.

## CONCLUSION

This Court should reject the FTC's speculative theories of anticompetitive harm, apply modern antitrust doctrine and economic reasoning, account for the procompetitive efficiencies of the proposed merger, and deny Plaintiff's Motion for Preliminary Injunction.

August 28, 2023

Respectfully submitted,

/s/ *John S. Playforth*

John S. Playforth (*pro hac vice pending*)
Ashley E. Bass (*pro hac vice forthcoming*)
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street, NW
Washington, DC 20001
Tel: (202) 662-6000
abass@cov.com
jplayforth@cov.com

*Counsel for Amici Curiae*
*The Chamber of Commerce*
*of the United States of America and*
*the National Association of Manufacturers*